UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **RICHARD ARMOLT, o/b/o JANET ARMOLT** | * | **CIVIL ACTION NO.  11-1490** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

**REPORT AND RECOMMENDATION**

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

**Background & Procedural History**

Janet Armolt protectively filed the instant application for Title II Disability Insurance Benefits on November 30, 2007.  (Tr. 118-120, 127).  She alleged disability as of June 22, 2007, because of blood clots in her lungs and legs, high blood pressure, swelling, shortness of breath, cataracts, and spine problems.  (Tr. 127, 141).  The claim was denied at the initial stage of the administrative process.  (Tr. 77-82). Thereafter, Armolt requested and received a June 18, 2009, hearing before an Administrative Law Judge ("ALJ").  (Tr. 35-76).  However, in a December 10, 2009, written decision, the ALJ determined that Armolt was not disabled under the Act, finding at Step Four of the sequential evaluation process that she was able to return to her past relevant work as an office manager – as she actually performed the job.  (Tr. 17-25).

Armolt appealed the adverse decision to the Appeals Council. Tragically, however, she passed away in February 2010, before the Appeals Council could act. (Tr. 13). On August 18, 2010, Armolt's surviving spouse, Richard Armolt, substituted as claimant on behalf of the decedent. (Tr. 13-14).

On March 18, 2011, the Appeals Council granted the request for review, and stated that it intended to find Armolt not disabled through December 10, 2009, but by tweaking the ALJ's rationale. (Tr. 114-117). Specifically, the Appeals Council stated that it intended to find Ms. Armolt not disabled because she was able to perform her past relevant work, not as she actually performed it, but as that position was generally performed in the national economy. *Id*. The Council afforded Richard Armolt and his representative 30 days to submit any comments or new and material evidence. *Id*.

On June 17, 2011, the Appeals Council acted upon its stated intentions, and issued a written decision finding Armolt not disabled at Step Four of the sequential evaluation process. (Tr. 1-5). In so doing, the Appeals Council adopted the ALJ's findings and conclusions, except for his finding that the claimant could return to her past relevant work, as she actually performed it. The Appeals Council's decision became the final decision of the Commissioner. (Tr. 1).

On August 17, 2011, Richard Armolt sought review before this court. He essentially argues that, for various reasons, the Commissioner's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is

supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the

SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that Armolt had not engaged in substantial gainful activity during the relevant period. (Tr. 22). At step two, he found that she suffered severe impairments of phebitis, thrombophlebitis, hypertensive cardiovascular disease, and degenerative arthritis of the lumbo-sacral spine. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. *Id*.

### II. Residual Functional Capacity

The ALJ next determined that Armolt retained the residual functional capacity to perform sedentary work,[1] reduced by the ability to only occasionally balance, stoop, crouch, crawl or kneel (but, never climb), with the need for a sit/stand option at will. (Tr. 22). Plaintiff challenges the sufficiency of the ALJ's residual functional capacity assessment on the grounds that the ALJ: 1) failed to incorporate all of the limitations recognized by the consultative physician, Clinton McAlister, M.D., despite purporting to assign substantial weight to his opinion; 2) did not accommodate plaintiff's urinary frequency; and 3) did not adopt a limitation recognizing plaintiff's alleged need to frequently elevate her legs. Plaintiff relatedly contends that the ALJ erred in his assessment of Armolt's credibility.

---

[1] Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

Because, as plaintiff emphasizes, the ALJ grounded his residual functional capacity assessment upon the findings of the consultative orthopedist, Clinton McAlister, M.D., his report issued in the aftermath of an August 6, 2009, physical examination represents an appropriate embarkation point for the court's review. (Tr. 388-392). At the examination, Armolt told Dr. McAlister that her chief complaint was back pain. *Id.*[2] She reported that she did well with her back until September 2008 when Dr. McHugh removed a tumor from her back. *Id*. She described her present pain as a five on a ten point scale. *Id*. Her pain remained mostly localized in her back, with a burning and stinging sensation. *Id*. There was no radiation or paresthesias. *Id*. She reported that her pain increased when she stood. *Id*. *McAlister noted that Armolt had no bowel or bladder difficulties*. *Id*. Armolt's pain increased if she stood or walked for extended periods. *Id*. She stated that she had to change positions every 15-30 minutes. *Id*.

Upon examination, Armolt demonstrated no difficulty transferring from the supine to the sitting position or from sitting to standing position. *Id*. She had some difficulty with squatting, but not with bending. *Id*. She walked with a normal gait, and did not use any orthosis or assistive device. *Id*. She had no spasms or radicular findings. *Id*. She was capable of fine manipulation, opposition, gripping, and grasping, bilaterally. *Id*. She had 5/5 pinch strength and 5/5 grip strength bilaterally. *Id*. The upper extremity neurological examination revealed no sensory deficit. *Id*. She exhibited a full range of motion of the hips, knees, and ankles with 5/5 strength and good stability. *Id*. Lower extremity neurological examination revealed no sensory deficit. *Id*.

Dr. McAlister diagnosed degenerative arthritis L5-S1 and history of deep vein thrombosis with pulmonary emboli. *Id*. There was no evidence of symptom magnification. *Id*. McAlister

---

[2] Dr. McAlister noted that he had reviewed Armolt's prior medical records. *Id*.

opined that Armolt could perform at the restricted light duty level, with maximum lifting of twenty pounds occasionally and ten pounds frequently. *Id*. He further noted that she "should be allowed to change positions every 30 minutes from sitting, standing, and walking." *Id*.

McAlister also completed a medical source statement. (Tr. 393-399). He formally documented that Armolt could frequently lift and carry up to ten pounds, and occasionally lift and carry up to twenty pounds. *Id*. She could sit for up to two hours at a time, and for six hours in an eight hour workday. *Id*. She could stand and/or walk for 30 minutes at a time, for up to one hour, each, in an eight hour workday. *Id*. She could frequently reach and manipulate. *Id*. Although she could never climb ladders or scaffolds, she could perform other postural activities on an occasional basis. *Id*. McAlister further indicated that Armolt could sort, handle, and use paper/files. *Id*. Although the form included a section that instructed McAlister to document any other work-related activities that were affected by her impairments, he left this section blank. *Id*.

Plaintiff contends that McAlister's finding that Armolt should be permitted to "change positions every 30 minutes from sitting, standing, and walking," should be interpreted to mean that Armolt needed to walk away from her work station at least every 30 to 60 minutes throughout the work day. Plaintiff argues that this interpretation logically follows from Armolt's statement to Dr. McAlister that it was painful for her to stand for any long period of time. She also emphasizes that it was important for someone with a history of deep vein thrombosis to walk around.

While this interpretation of McAlister's findings is plausible, the record contains substantial evidence to support the ALJ's implicit finding that plaintiff only needed to alternate sitting and standing at will, while remaining at her work station. *See* Tr. 22, 70. For instance, Armolt testified at the hearing that for pain relief, or if her legs were swelling, she would stand

7

up if she were sitting, and sit down if she were standing – she just needed to get up and move. (Tr. 59). Furthermore, other than sitting in a regular chair and standing up, she said that her only other pain relief activity consisted of prayer. *Id*.  Armolt also reported that her daily activities included sitting in a plastic chair, which was less painful to her than a couch or recliner, for two hours at a time while she visited with friends. (Tr. 132). Later in the afternoon, she typically would sit and visit with her sister for two hours. *Id*. Thereafter, she ordinarily would sit for yet another two hours at a desk and do paperwork. *Id*.

The court also notes that the vocational expert testified that there were times during the work day when the worker has to move about the office as part of her duties. (Tr. 70). In addition, there are normal break periods in the morning, afternoon, and for lunch. *See* Tr. 71. Thus, to the extent that McAlister's report can be interpreted to mean that plaintiff should be able to walk periodically during the work day, there is substantial evidence for the ALJ's implicit finding that this could be achieved as part of her normal work duties and/or breaks.

Plaintiff further argues that the ALJ erred by declining to adopt a limitation regarding her need to frequently elevate her legs throughout the day. Plaintiff emphasizes that Armolt needed to do this because of her deep vein thrombosis and peripheral edema. For support, she relies on her own testimony and a medical source statement completed on January 30, 2009, by her treating neurosurgeon, Bernie McHugh, M.D. (Tr. 354). However, the efficacy of Dr. McHugh's medical source statement is undermined by his last treatment note some three months earlier. At that time, McHugh noted that Armolt had done quite well following her intradural mass resection at L1/L2, L2/L3 that she had undergone in September 2008. (Tr. 355). McHugh indicated that Armolt's pain syndrome had decreased significantly, and that he had discussed increasing her activity level, as tolerated, with the ability to lift up to 25 pounds. *Id*.

Furthermore, even during periods when Armolt was experiencing an exacerbation of her peripheral edema, plaintiff's treating physician, Donna Donald, M.D., prescribed support hose, and instructed her to elevate her legs (above her heart) only twice per day. (Tr. 402). There is no indication that Armolt could not have effected same during normal work-breaks and/or after work hours.

Of course, the consultative physician, Dr. McAlister, did not assign any limitation as to plaintiff's need to frequently elevate her legs throughout the workday. Insofar as McAlister's finding conflicted with Dr. McHugh's opinion in this regard, the ALJ favored the former's opinion because it was consistent with the medical record. (Tr. 24). The ALJ's stated evidentiary rationale is supported by substantial evidence. *See* discussion, *supra*; *Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.); *see also Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions); *Richard ex rel. Z.N.F. v. Astrue*, 2012 WL 2299479 (5th Cir. June 15, 2012) (unpubl.) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however tersely); *Garth v. Astrue*, 393 F. App'x 196, 199 (5th Cir. Aug. 26, 2010) (unpubl.) (court noted that ALJ *could have* discounted treating physician's opinion because the opinion contradicted his own treatment notes and the claimant's admissions); *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th Cir. April 20, 2011) (unpubl.) (upholding ALJ's decision to discount treating physician's opinion because, as the ALJ explained, it was "not supported by the objective findings of his own clinic notes nor by the evidence as a whole.").

Plaintiff also argues that Armolt's Lasix medication caused her to suffer from urinary

incontinence, which required her to frequently leave her work station. Dr. McAlister noted, however, that Armolt had no bladder difficulties. Furthermore, although Armolt complained of a *history* of urinary urgency to Dr. McHugh in August 2008, she did not complain of incontinence. (Tr. 357-360). At the hearing, Armolt attributed her urinary frequency to her Lasix prescription. Tr. 51. Previously, however, she failed to document any side effects from her medication. (Tr. 157). Although Armolt started on Lasix in March 2006, she managed to work for over one year while on the medication. *See* Tr. 204, 183.

      Plaintiff further argues that the ALJ's credibility determination is not supported by substantial evidence. When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. SSR 96-7p. The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ need not follow formalistic rules in his credibility assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

      In this case, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Tr. 24). The ALJ further noted that Armolt had minimal credibility insofar as she claimed to suffer from debilitating symptoms and limitations, given the paucity of objective and other evidence. *Id*. Indeed, when she filed for disability, Armolt's daily activities included sitting in a chair (not a recliner) for six hours per day. *See* discussion, *supra*. Moreover, she was able to stand for over an hour daily to prepare her husband's supper. (Tr. 133-134).

The court further notes that during a November 13, 2007, visit to her nurse practitioner, plaintiff inquired when she could go back to work. (Tr. 292). Her nurse practitioner saw no reason for her not to go back to work. *Id*. The nurse released her to return to work, and advised her to start walking at the mall to increase her exercise. *Id*. Despite having been advised on November 13 by her treating physician's staff that she could return to work, Armolt instead made inquiry with the SSA some two weeks later about applying for disability. *See* protective filing date.

Plaintiff emphasizes that Dr. McAlister found Armolt to be credible and that he noted that she did not engage in symptom magnification. The record, however, contains contrary evidence suggesting that she tended to exaggerate or embellish her symptoms. For instance, Armolt complained at the hearing that her hand would shake, and that she would drop everything that she picked up. (Tr. 47). Armolt recounted similar progressive symptoms to Dr. McHugh during an August 8, 2008, examination. (Tr. 357-360). Nevertheless, upon examination, Armolt exhibited 5/5 strength in all motor groups in the bilateral upper and lower extremities. *Id*. No atrophy or fasciculations were noted. *Id*. Muscle tone was normal. *Id*. Light touch, pinprick, vibration, and proprioception were all intact in all extremities. *Id*. Deep tendon reflexes were equal bilaterally. *Id*. Her gait was normal. *Id*. No tremors were seen. *Id*. She exhibited a full range of motion in the cervical and thoracolumbar spine. *Id*.

Armolt suggests that her condition worsened after her August 2009 examination with Dr. McAlister. However, during an October 5, 2009, wellness examination, Armolt reported that her hand and foot numbness was no more than intermittent. (Tr. 408-411). She also had no clubbing, cyanosis, or edema in her extremities. *Id*. She demonstrated 5/5 motor in touch, with normal proprioception. *Id*.

Plaintiff makes much of the fact that Armolt's treating physician's office accommodated her request for a handicap parking tag, which was an implicit finding that she had a severe mobility limitation. This implicit finding, however, is not necessarily inconsistent with Dr. McAlister's finding that Armolt was limited to 30 minutes of walking at one time, or the ALJ's recognition that Armolt was limited to walking and standing for a total of two hours per work day.

The court further notes other instances of embellishment or inconsistency. For instance, when plaintiff was hospitalized in August 2007 for her deep venous thrombosis, she reported two prior heart attacks. (Tr. 259-262). Dr. Mathews, however, was skeptical of this claim, and thought that it sounds more like angina. (Tr. 259-262). Moreover, at the hearing, Armolt told the ALJ that she had a bachelor's degree. (Tr. 44). Two months later, she told Dr. McAlister that she only had a high school "degree." (Tr. 389). Plaintiff also testified at the hearing that her medication caused her to suffer from all of the side effects mentioned on television. *See* Tr. 50. Plaintiff did not include these multiple side effects on her disability application, however. *See* discussion, *supra*.

Finally, to the extent that plaintiff contends that Armolt's unfortunate death only a few short months after the ALJ's unfavorable decision serves as the ultimate proof of her precarious health and inability to work, the court notes that the causes of death on her death certificate were listed as *acute* renal failure, *acute* respiratory failure, and pneumonia. (Pl. Brief, Exh. A). In other words, there is no indication that her death was caused by her chronic impairments. Even if a correlation could be established between Armolt's death and her chronic impairments, there is nothing to indicate that it was not a "later-acquired disability or . . . the subsequent deterioration of the previously non-disabling condition." *Haywood v. Sullivan*, 888 F.2d 1463, 1471-1472 (5th

Cir. 1989) (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir.1985) (internal quotation marks omitted)). In fact, Armolt's most recent treatment note issued just three weeks before the ALJ's decision, reflects that she was doing better, and that her peripheral edema had improved. (Tr. 401).

Accordingly, the court finds that the ALJ's credibility analysis satisfied the requirements of 20 C.F.R. § 404.1529, and his resolution is supported by substantial evidence. *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

The undersigned further finds that the Commissioner's residual functional capacity assessment is supported by substantial evidence.[3]

## **Conclusion**

The Commissioner in this case was tasked with determining whether Armolt was disabled. In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was by no means uniform and could have supported a different outcome. Such conflicts in the evidence, however, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d

---

[3] Plaintiff does not allege any error with the Commissioner's step four finding independent of his challenge to the sufficiency of the residual functional capacity assessment.

656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra*.[4] That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that Armolt was not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision to deny disability benefits be **AFFIRMED**, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

---

[4] Admittedly, this court has expounded upon some of the reasoning given by the Commissioner for his decision. Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id*. This exception is applicable here. Further, the Fifth Circuit implicitly has sanctioned the federal courts' practice of assigning independent reasons for discounting newly adduced evidence. *See e.g., Foster v. Astrue*, 2011 WL 480036 (5th Cir. Feb. 10, 2011) (unpubl.); *Garth v. Astrue*, 393 Fed. Appx. 196 (5th Cir. Aug. 26, 2010) (unpubl.).

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 13th day of July 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE